IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| CHARLENE CASSIDY,<br><br>        Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>        Defendant. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 1:17-cv-153-TC |

Charlene Cassidy has appealed the Social Security Administration's (SSA) denial of her application for disability benefits under the Social Security Act. Ms. Cassidy claims benefits under both Title II (disability insurance) and Title XVI (supplemental security income) of the Act. In her benefits application she asserted that she was disabled based on numerous physical and mental impairments (she alleged bipolar affective disorder, panic disorder, agoraphobia, generalized anxiety disorder, ADHD, and obesity).

Her appeal focuses primarily on her contention that the administrative law judge (ALJ) improperly discounted an IQ test when he concluded that she did not satisfy the criteria of "intellectual disability." She also challenges the ALJ's equivalency analysis,[1] the

---

[1] In an equivalency analysis, an ALJ must determine whether an impairment that does not fit within the exact letter of a disability category is medically equivalent to the listed mental impairment in severity and duration. (SSA Program Operations Manual System DI 24515.056 ("Evaluation of Specific Issues — Mental Disorders — Determining Medical Equivalence").)

1

disproportionate weight he placed on the opinions of the non-treating application examiners, and his reliance on the vocational expert's allegedly-flawed conclusion about which jobs Ms. Cassidy has the capacity to perform.

For the reasons stated below, the court remands Ms. Cassidy's case to allow the SSA to re-evaluate her disability application under the "intellectual disability" impairment criteria set forth in SSA listing 12.05 and then, if necessary, present the conclusions to the ALJ for a fresh analysis of that listing.

## BACKGROUND

In her April 2014 application for disability benefits, Ms. Cassidy asserts that she has been disabled since October 1, 2007. Here, the only issue is whether she "is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act." (Nov. 9, 2016 SSA Office of Disability Adjudication and Review Decision ("ALJ Decision"), R. 30.[2])[3]

The SSA initially reviewed Ms. Cassidy's application in September 2014 through state agency disability reviewers (Disability Determination Services or DDS). June Steinvorth, M.D., and Mark Berkowitz, Psy. D., issued their analyses on September 2, 2014, and denied her application. (R 73–94.) On reconsideration (at Ms. Cassidy's request), a new set of claim reviewers— Dennis Taggart, M.D., and Joan Zone, Ph.D—issued reports. (See Dec. 22, 2014 Case Analyses (R. 103–112, 117–126).) Drs. Taggart and Zone gave opinions similar to the other reviewers' conclusions and also rejected her application.

---

[2] When Ms. Cassidy appealed to this court, the SSA filed the complete record for review. (See Docket No. 15 (sealed administrative record).) The court uses "R." to refer to pages in that record.
[3] The Act defines "disability" as the inability to work at substantial gainful levels due to a severe physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least twelve consecutive months. 42 U.S.C. § 423(d).

Ms. Cassidy then requested a hearing before an ALJ. That hearing was held in September 2016, where Ms. Cassidy appeared and testified on her behalf. A vocational expert also testified.

In connection with the hearing, Ms. Cassidy introduced evidence obtained after DDS reviewers completed their September and December 2014 evaluations. She offered a September 23, 2016 report of the results of an IQ test performed by Dr. Lori Kotter (see R. 832–35), an August 25, 2016 form completed by Ms. Cassidy's psychiatrist (see R. 826–28), and a one-page "Physician's Assessment of Physical Capacities" completed by Dr. Jonathan Weeks (R. 830).

The ALJ issued a written opinion on November 9, 2016, denying Ms. Cassidy's application after concluding that she was not disabled. That opinion was affirmed by the appellate arm of the SSA. Ms. Cassidy appeals the ALJ's decision to this court.

In the opinion, the ALJ followed the standard five-step sequential evaluation process to determine whether Ms. Cassidy is disabled.

> Step one requires the claimant to demonstrate that he is not presently engaged in substantial gainful activity. At step two, the claimant must show that he has a medically severe impairment or combination of impairments. At step three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits. If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work.
>
> If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy, given her age, education, and work experience. If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary.

Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotation marks and citations omitted; brackets in original). See also 20 C.F.R. § 404.1520(a)(4).

Ms. Cassidy satisfied the requirement of Step One (no "substantial gainful activity" or SGA).

The ALJ found at Step Two that Ms. Cassidy has several severe impairments: obesity, degenerative disc disease of the lumbar spine, bipolar disorder, anxiety, panic disorder, agoraphobia, ADHD, and mild intellectual disability. (R. 33.)

At Step Three, he found that she did not satisfy the criteria of any per se—i.e., listed—disabling impairment set forth in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. 32–36). He reached this conclusion about her physical as well as her mental impairments.

In her appeal, Ms. Cassidy does not address the ALJ's conclusions that she is not physically disabled. She only addresses the conclusions regarding the mental disability listings.

For the mental impairments, the ALJ looked at listings 12.02 ("Organic Mental Disorders"), 12.04 ("Affective Disorders"), 12.05 ("Intellectual Disability"), and 12.06 ("Anxiety Related Disorders"). Listing 12.05 is the one most discussed in Ms. Cassidy's appeal to this court.

The ALJ stated numerous times that there was "no evidence" showing that her conditions met or equaled a listed impairment. Although he sets forth selected information from the record (which is done in the section discussing her RFC), the ALJ does not analyze it. Instead, he concludes in a perfunctory manner that she does not have evidence of the various listing criteria.

He proceeded to Step Four, where he evaluated her RFC (which represents the most the claimant can still do despite her functional limitations). 20 C.F.R. § 404.1545. The ALJ found that Ms. Cassidy retained the residual functional capacity for a limited range of simple work. (R. 36–43.)

4

At Step 5, he consulted the vocational expert (VE) at the hearing. He presented a hypothetical scenario to the VE, and asked whether a claimant with the same age, education, work experience, and RFC could perform working existing in significant numbers in the national economy. Specifically, at the hearing he presented the following question to the VE:

> Please assume a hypothetical person of the claimant's age, education, and lack of past work history. Further assume that this person can work at the light exertional level, except this person can never climb ladders, ropes or scaffolds. Can occasionally climb ramps and stairs as well as occasionally stoop and kneel. This person can frequently balance, crouch, and crawl. Now, this person would also be limited to simple, routine and repetitive tasks in a work environment free of fast paced production requirements, involving only simple work related decisions with few[,] if any, workplace changes and only occasional interaction with the public and coworkers. Would such a person be able to perform any work in the national economy?

(ALJ Hr'g Tr. at 16, R. 65.)

The VE answered "yes" and concluded that Ms. Cassidy could perform light unskilled work, including the representative occupations of marker, mail clerk, and addresser (generic theoretical jobs listed in the "Dictionary of Occupational Titles"). (R. 43–44, 65–68.) Based on the VE's testimony, the ALJ found that Ms. Cassidy was not disabled within the meaning of the Act. (R. 44.)

## ANALYSIS

### Standard of Review

Under 42 U.S.C. § 405(g), the scope of the court's review of the Commissioner's final decision is specific and narrow. The court is limited to considering whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). Substantial evidence means relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." Id. at 1084 (internal quotation marks and citation omitted). The evidence must be "more than a

5

scintilla" but may be "less than a preponderance." Id. The court must not reweigh the evidence or substitute its judgment for that of the ALJ. Id. Where the evidence as a whole supports the ALJ's decision, the court must affirm even where it would have reached a different result had the case been before it de novo. Ellison v. Sullivan, 929 F.2d 534, 536 (10th Cir. 1990). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Zoltanski v. FAA, 372 F.3d 1195, 1200 (10th Cir. 2004).

**Listing 12.05C – "Intellectual Disability"**

Ms. Cassidy's appeal focuses on the ALJ's analysis of her claim of mental, rather than physical, disabilities. She addresses the ALJ's consideration of whether her mental condition satisfied the criteria for "intellectual disability" under Listing 12.05C of the SSA regulations. (See R. 33–36.) In order to satisfy Listing 12.05C, a claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22, with the required level of severity established by a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. pt. 404 subpt. P, App. 1, Listing 12.05C (2016).[4]

In arguing that her condition existed before she turned 22, Ms. Cassidy primarily relies on the 2016 IQ test report issued by Dr. Lori Kotter and her educational records, including a transcript of her high school grades and her Section 504 Accommodation Plan created at the Boise Intermountain Hospital residential treatment unit where she stayed for four months at the age of 16.

---

[4] The 2016 listing (which was in effect when the ALJ issued his decision) applies here.

The SSA's reviewing experts from the state Disability Determination Services (DDS), who issued their case analyses in 2014 (and upon which the ALJ placed great weight), did not have the benefit of Dr. Kotter's IQ test report that Ms. Cassidy submitted to the ALJ in 2016. And, significantly, they did not address the 12.05 listing.

But the ALJ did not send the matter back to DDS to re-evaluate Ms. Cassidy's disability application in light of that new evidence and her new assertion that she meets the 12.05C listing. He found it unnecessary:

> The recently-procured intellectual evaluation at B16F [the report of Dr. Lori Kotter's IQ test of Ms. Cassidy (R. 832)] would support the IQ criterion of paragraph C, <u>but the educational evidence at B1F [academic records submitted by Ms. Cassidy] is from a very short period of time and tends to show that the claimant's educational difficulties were **caused by emotional disturbance** rather than significantly subaverage general intellectual functioning. Her **grades at the residential facility were good** and her **testing indicated average abilities** in math, reading, and writing.</u> Thus, the medical evidence of record overall does not show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., … before age 22."

(R. 36 (emphases added).)

The Commissioner, in her opposition brief, attempts to justify the ALJ's decision not to remand the IQ evidence and the 12.05 analysis to the DDS. According to the Commissioner, the ALJ found no evidence of "deficits in adaptive functioning," and, consequently, the IQ test results did not affect the outcome. She outlines the standard governing analysis of that criterion:

> An essential feature of intellectual disability is "impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 37 (5th ed. text rev. 2013). Deficits in adaptive functioning "refer to how well a person meets community standards of personal independence and social responsibility" compared to their peers. <u>Id.</u> For a diagnosis of intellectual disability, a domain of adaptive functioning must be "sufficiently impaired [such] that ongoing support is needed in order for the person to perform adequately" in that domain. <u>Id.</u> Significantly, any such deficit in adaptive functioning "must be directly related" to the individual's deficit in intellectual functioning. <u>Id.</u>

7

(Def.'s Answer Brief at 10, ECF No. 20.)

But the ALJ does not expressly state that as his reason for rejecting Ms. Cassidy's argument that the 12.05 listing has been met. In fact, the only portion of his opinion arguably connected to the "deficits in adaptive functioning" is a quote of the regulation's criterion: "[T]he medical evidence of record overall does not show 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., … before age 22.'" (R. 36 (quoting Listing 12.05).)

The Commissioner, by asserting that Ms. Cassidy did not establish "deficits in adaptive functioning" before age 22, offers a post-hoc rationalization for the ALJ's decision. The court must evaluate the ALJ's decision solely based on the reasons stated in the opinion, not in the Commissioner's brief. Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004). A district court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." Haga v. Astrue, 482 F.3d 1205, 1207–08 (10th Cir. 2007). A "post hoc effort to salvage the ALJ's decision would require [the courts] to overstep [their] institutional role and usurp essential functions committed in the first instance to the administrative process." Allen v. Barnhart, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004).

If he relied on the "deficits in adaptive functioning" criterion, he did not cite to the DSM, describe the standard he applied, or expressly state that that criterion was unsupported by the record. These are necessary elements, for without them the court cannot conduct a meaningful review.

In Barnes v. Barnhart, 116 Fed. App'x 934 (10th Cir. 2004), the Tenth Circuit explained the process for determining whether the claimant has established "deficits in adaptive

functioning." There, the court remanded the matter so the ALJ could identify and apply a professionally-recognized method for measuring the adaptive functioning criterion.

> The Commissioner publicly announced in April 2002 that there are at least four possible definitions of "deficits in adaptive functioning"– from the four major professional organizations dealing with [intellectual disability]. See 67 Fed.Reg. at 20,022. … [T]he Commissioner expressly declined to adopt any particular one of these definitions because the four major organizations use somewhat different definitions and methods for assessing them. [Id.] The Commissioner considers the definition of [intellectual disability] reflected in the listings to be consistent with these definitions, although not identical to any one of them, and "allow[s] use of any of the measurement methods recognized and endorsed by the professional organizations." Id.

Id. at 942. The Barnes court commented that the ALJ in that case "essentially improvised his own definition for 'deficits in adaptive functioning'" and so it directed the ALJ to "choose a standard consistent with the Commissioner's directive." Id. at 942. Here, to the extent the ALJ was rejecting the application based on that adaptive functioning criterion (and it is difficult to tell from the language of the opinion), remand is necessary to allow the ALJ to articulate the standard by which he measures the adaptive functioning criterion.

Alternatively, the ALJ may have rejected the 12.05C claim for a different reason. In the sentence explaining the ALJ's rejection of the IQ test,[5] the ALJ said that record evidence was inconsistent with the IQ test results, which suggests the ALJ was analyzing the other criterion of 12.05C: "significantly subaverage general intellectual functioning." He found that her grades "were good" and that her testing "indicated average abilities in math, reading, and writing." (R. 36.) He then concluded that her educational performance was caused by "emotional disturbance" rather than intellectual deficits. (R. 36.)

---

[5] "The recently-procured intellectual evaluation at B16F [the Kotter IQ test results] would support the IQ criterion of paragraph C, but the educational evidence at B1F [the Intermountain packet listing grades and the 504 Accommodation Plan] is from a very short period of time and tends to show that the claimant's educational difficulties were caused by emotional disturbance rather than significantly subaverage general intellectual functioning." (R. 36.)

If he was only focusing on the criterion of 'significantly subaverage general intellectual functioning," the court is concerned because he evaluated the evidence and made the decision without the benefit of the DDS opinions. Moreover, his conclusion is not supported by substantial evidence.

Certainly the evidence shows that her academic performance was not consistently poor. The ALJ notes that Ms. Cassidy had Bs and B+s during her time at Intermountain Hospital and that "[h]er grades at the residential facility were good." (R. 36.) He was referring to the Intermountain Hospital Academic Discharge Summary listing grades obtained in Math, English, Earth Science, Teen Living, and P.E. during her four-month stay. (See R. 239.) But her high school grade transcript paints a different story. Although it shows a few Bs, it consists of mostly Cs, Ds, and Fs. (R. 330.) Her overall GPA for the two-year period was 1.4. (R. 330.) She did not graduate from high school although she did obtain her GED years later (she testified that her mother enrolled her in Sylvan Learning Center classes (ALJ Hr'g Tr. at 13, R. 62)).

The record shows that the probative value of the grades issued by Intermountain is low. First, they reflect a period of four months of instruction at an inpatient residential facility, not a normal classroom setting. (R. 329.) They were "based on [the] student's participation and completion of graded assignments <u>done to the best of [the student's] abilities with one-on-one tutoring assistance available as needed.</u>" (R. 329 (emphasis added).) Second, the vague descriptions of the classwork she completed suggests that the level of instruction was less rigorous, or at least different than a typical high school class. For example, in the math category, the facility representative wrote that "Charlene worked on improving her skills in percents." (R. 329.) In English, "Charlene completed a number of assignments," and, similarly, in Earth Science "Charlene completed chapters." (R. 329.)

10

The ALJ stated that testing done by Intermountain "indicated average abilities in math, reading, and writing." (R. 36.) But that test report, rather than showing an across-the-board average performance, showed inconsistencies in her performance. While it indicated that her "Broad Written Language" skill was "within the average range of scores obtained by others at her grade level," the tester ranked her in the 47th percentile. (R. 339.) Her "Broad Reading" skills were better, with a percentile rank of 72. (R. 339.) But her "Broad Mathematics" skill ranked in the 25th percentile. (R. 339.) Moreover, the Table of Scores showed wildly varying scores: the percentiles ranged from 20th percentile to 83rd percentile. (R. 341.)

Finally, after citing to the evidence of Ms. Cassidy's grades at Intermountain, the ALJ found that the record of her academic performance tended to show that her "educational difficulties were caused by <u>emotional disturbance</u> rather than significantly subaverage general intellectual functioning." (R. 36 (emphasis added).)

It is apparent that she was hospitalized for mental health issues. But the leap the ALJ makes—i.e., that her low grades were not the result of intellectual deficits—is not explained. Moreover, with the recent IQ test results, it is premature to reject the meaning of her failing grades in a normal high school setting when the state disability examiners did not have the IQ test results and did not consider the 12.05 listing.

Given inconsistencies in Ms. Cassidy's academic performance, the record should be supplemented, if possible, to flesh out her education record.

> "It is beyond dispute that the burden to prove disability in a social security case is on the claimant." <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164 (10th Cir. 1997); 20 C.F.R. § 404.1512(a) ("[Y]ou must bring to our attention everything that shows that you are AAA disabled."). Nevertheless, because a social security disability hearing is a non adversarial proceeding, the ALJ is "responsible in every case 'to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.'" <u>Hawkins</u>, 113 F.3d at 1164 (quoting <u>Henrie v.</u>

11

United States Dep't of Health & Human Servs., 13 F.3d 359, 360–61 (10th Cir. 1993)); 20 C.F.R. § 404.944 (requiring the ALJ to "look[] fully into the issues").

Madrid v. Barnhart, 447 F.3d 788, 790 (10th Cir. 2006). Then the DDS reviewers can complete the analysis and the ALJ will have a better record upon which to make his decision.

**<u>Weight Given to Conclusions of Examining Physicians</u>**

With the exception of the numeric IQ score in Dr. Kotter's report, the ALJ discounted the weight of her report. The ALJ summarized the report:

> Consultative examiner Lori Kotter, Ph.D. opined on September 23, 2016 that the claimant would have difficulty communicating with others and would not be able to understand verbally presented information as well as her peers; would not generally be able to recall instructions and directions, and needed to be given instructions in brief and short intervals; needed instructions that were specific, simple, and given slowly one at a time; and would not perform well on tasks that were time-limited and needed to avoid fast paced work environments.

(R. 42.) He found that opinion evidence unpersuasive: "Dr. Kotter examined the claimant on one occasion, does not have a longitudinal history of treating the claimant, and did not have access to the other medical and educational evidence of record when she rendered her opinions." (R. 42.) He gave significantly more weight to the non-examining DDS reviewers at the state agency (yet they did not have the test results generated by Dr. Kotter).

Dr. Kotter was qualified to administer the IQ test. Her findings at the end of the report[6] were based on her experienced observations and understanding of Ms. Cassidy's performance

---

[6] She discusses what Ms. Cassidy's abilities based on her observations and the results of her IQ test. For example, she wrote, "Ms. Cassidy will have difficulty communicating with others and will not be able to understand verbally presented information as well as other adults her age." (R. 834.) She also concluded that "Ms. Cassidy's score on the Working Memory Index fell in the borderline range and indicated she has far below typical short-term memory attention and concentration. Based on her results, Ms. Cassidy will not generally be able to recall instructions and task directions as well as other adults her age." (R. 835.) And she said Ms. Cassidy "will not perform well on tasks that are time-limited and fast paced work environments will need to be avoided." (R. 835.)

12

during the testing process. The fact that she does not have a history of treating Ms. Cassidy does not detract from the value of her professional opinion.

An IQ test, as a one-time test, by its nature cannot contain a conclusion based on years of treatment. Yet it is still valuable. The ALJ unnecessarily rejected the written findings at the end. Those findings showed significant intellectual deficits, with all category rankings falling in the single-digit percentiles. (R. 833–34.) The report is certainly not dispositive, but it is valuable evidence and the ALJ improperly discounted Dr. Kotter's conclusions.

The court does agree with the ALJ's treatment of Dr. Dennis Smith's report dated August 25, 2016 (apparently, a mental RFC). (R. 826–28.) That report has no narrative; instead it presents a relatively generic checklist containing legal terms applicable to evaluation of a disability application. The ALJ understandably characterized the analysis as "the product of pre-printed questionnaires" containing "leading questions" designed to elicit "verification of legal conclusions about the claimant's alleged impairments." (R. 41.) The form has a "fundamentally suggestive construction" and appeared to be "intended to further the claimant's litigation interest rather than provide an objective medical evaluation of her functional limitations[.]" (R. 41.)

**Vocational Expert Testimony**

Because the court remands the matter, it does not address the issue of whether the ALJ's hypothetical to the Vocation Expert, the Vocational Expert's conclusion, and the ALJ's reliance on that conclusion were correct.

**Conclusion**

The case must be remanded to correct a fundamental flaw in the decision. Disability Determination Services (the initial claim reviewers whose opinions were given substantial weight by the ALJ) did not have the IQ test report and did not consider the 12.05 listing. The

evaluation of her application must be redone to address that potential category of disability. Accordingly, the court remands the case so that the initial reviewers may analyze Ms. Cassidy's claim of a 12.05C disability in light of the evidence provided in 2016 to the ALJ (particularly Dr. Kotter's report), as well as evidence that can clarify Ms. Cassidy's academic performance before the age of 22.

Once they have done that, the ALJ must evaluate their conclusions and issue a decision that takes into account the court's concerns about his treatment of the academic performance evidence and the relatively conclusory nature of his analysis, including his unexplained conclusion that Ms. Cassidy has not shown that her condition equals the 12.05 listing (i.e., his equivalence analysis).

**ORDER**

For the foregoing reasons, the matter is remanded to the SSA. Upon remand, the SSA should begin with an analysis by the DDS of the 12.05 listing, taking into account the 2016 evidence and any supplemental educational performance evidence. Then the ALJ, if necessary, should issue a decision on Ms. Cassidy's 12.05C claim of disability in light of the court's concerns expressed above.

DATED this 16th day of April, 2019.

BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
U.S. District Court Judge